John D. Bennett, S.
In this proceeding the court is required to cionstrue paragraph 11 Third ” of the will in which the decedent bequeathed “ All assets which form a portion of my estate *932 which I may have inherited from my husband habby jacksoh, including any "of the contents of our residence property, I give * * # unto my husband’s niece, marion f. jackson
Although at first blush the language quoted appears clear, its seeming simplicity belies the complications which have arisen. The following is a summary of some of the surrounding circumstances.
Harry Jackson, the husband of Cecile Fleet Jackson [the decedent], for sometime prior to his death on July 1,1959 had a safe-deposit box No. 97 in the Bank of Westbury Trust Company. Cecile, during the same period, also had a safe-deposit box in the same bank, No. 145. Following the death of Harry Jackson, an inventory of his box No. 97 was made on July 17, 1959 in the presence of a representative of the State Tax Commission. Thereafter on July 28, 1959, the decedent executed her will containing paragraph “Third”. The draftsman of Cecile’s will testified that prior to the execution of the decedent’s will, he told her that “ she should continue Box 97 with Mr. Jackson’s securities so that upon her death they would be readily identifiable under the terms of the will ”. Again, on the same page, her attorney said: “ Well, that was the substance of [the conversation], to identify his stock upon her death.”
During the administration of Harry Jackson’s estate, Mrs. Jackson and her attorney withdrew all of the securities from safe-deposit box No. 97, apparently in the Spring of 1960. The securities remained with the attorney’s firm for a short period during which they were transferred to the name of Cecile Fleet Jackson. Thereafter the attorney made an appointment to meet Cecile at the bank with all of the securities which had previously been removed and they were then placed back in box No. 97. Also box No. 97 which had been in the name of the decedent’s husband was placed in her name, but both boxes No. 97 and No. 145 were maintained by her as separate receptacles until her death. The attorney testified that each and every certificate found in Harry Jackson’s safe-deposit box was replaced there after the transfer of names.
Following the death of her husband, Cecile’s sole source of income represented dividends on her stockholdings. While her husband’s estate was being administered, her attorney stated that he had a conversation with the decedent concerning these dividends. He testified that Mrs. Jackson, at that time, was concerned about the shortage of her own money and she wanted to know what she could do about the money represented by dividends from stock that was in the Harry Jackson estate. He testified that his answer to her was as follows: “ I told her that *933 the dividends all belonged to her and that she had a right to use them in any way that she wanted as well as the stock that came from Harry Jackson’s estate, that it was all hers and she could do as she pleased with it. There was no agreement between her and Harry Jackson * * * that she could carry out any wish that he wanted that was her wish and she could do what she wanted with any of her property ’ ’.
Following her husband’s death, Cecile visited both safe-deposit boxes at more or less regular intervals up until November 14, 1961, which was her last recorded entry into the safe-deposit boxes. The only other recorded entry into either box was made by her brother on June 4, 1962 when, under instructions from her, he placed certain papers in one of the boxes.
Beginning in the early part of 1963, within seven months of her death, the decedent began receiving substantial amounts of stock dividends and stock distributions representing 2 for 1 stock splits on stock received from her husband. These dividends and distributions amount to approximately $57,000. Within a short time before her death, these stock dividends and stock distributions were sold by the decedent. Her brother testified that in each instance, he drove her to the bank for such purposes, and that she remained in the car and would give him an envelope and tell him to have the contents sold. Her brother further testified that the decedent must have signed the assignments transferring the stock certificates which were sold at the bank. The decedent’s attorney was able to testify that the signatures appearing on the stock assignments relating to the stock distributions and dividends received were in the handwriting of the decedent. Exhibit 4 comprises a group of memorandums of securities sold for the decedent’s account, together with, in each case, an “ advice of credit” indicating that the proceeds of sale were credited to the decedent’s account in the Bank of Westbury Trust Company. It was stipulated at the hearing, without conceding its materiality, that the decedent’s checking account contained a balance of $23,638.02 of her own funds at the time the first sale of stock dividends or distributions was made.
Following Cecile’s death, safe-deposit boxes No. 97 and No. 145 were separately inventoried. The contents of box No. 97 were found to include in two separate instances stock dividends on shares received by her from her husband. Box No. 145, in addition to the securities individually owned by the decedent, included 12 shares of United States Trust Company stock which the decedent had received as a stock dividend on shares inherited from her husband.
*934 Harry Jackson’s niece, Marion F. Jackson, the petitioner in this proceeding, contends that within the scope of the bequest to her under paragraph ‘ ‘ Third ’ ’ is included not only the assets inherited by the decedent from, her husband, which were held by her at her death in the same form in which she received them from his estate, but in addition all shares of stock owned by the decedent at her death representing stock distributions received by the decedent with respect to securities inherited from her husband, as well as the proceeds of sales of all such stock distributions to the extent that they formed a part of her estate at her death.
From the inception of this proceeding, the petitioner has vigorously opposed the reception of any extrinsic evidence, claiming that the bequest to her is clear and unambiguous. The executors, in a sense, have acquiesced in the assumption that extrinsic evidence is unnecessary, claiming that the problem is simply one of ademption, citing cases such as Matter of Ireland (257 N. Y. 155), to the effect that the nonexistence of a specific legacy works an ademption without regard to the testator’s intention.
The petitioner relies heavily upon the case of Matter of Potter (244 App. Div. 130, affd. without opn. 269 N. Y. 545). In that case the decedent received a large amount of property under her husband’s will with a request that she so divide what was left between his children, two of whom were by a former marriage, so that each would receive an equal amount. In effectuating her husband’s desire, the testatrix provided as follows: “I do hereby make two divisions or parts of my last Will and Testament, by one of which I dispose of the property left to me by my late husband, as nearly' as possible in compliance with his wishes, and by the other of which I dispose of the property which came to me and which I received from other sources.” The court, struggling with the idea of achieving equality between the two classes of children,"held (p. 134) that the question was “not primarily one of ademption but of description as in Matter of Martin (252 N. Y. 582).” The court concluded that the ‘‘ provision was intended to cover the property received by the testatrix from her husband’s estate and all property into which she converted any such property so far as such conversion can be traced, but that it does not include income therefrom.”
Petitioner argues that Matter of Potter (supra) is entirely controlling here and that the reception of extrinsic facts cannot be received to change the bequest from what it specifically states, a bequest of all assets forming a part of the decedent’s *935 estate inherited from her husband into a bequest of such assets forming a portion of her estate located in safe-deposit box No. 97. This the petitioner contends would result in rewriting the testatrix’ will.
' While it is true that this court has no power to make a new will for the testatrix, the real problem even as stated in Matter of Potter (supra), so strongly advanced by the petitioner, is primarly one of description, and resort to extrinsic evidence of surrounding circumstances with regard to the property intended to be described has generally been held proper (4 Page, Wills [Bowe-Parker Rev.], §§ 32.3, 32.4; see, also, Matter of Constantine, 36 Misc 2d 711, 713 and cases there cited).
In Matter of Smith (254 N. Y. 283, 289), the Court of Appeals stated: “It is the modern rule that ‘ with the exception of direct statements of intention, no extrinsic fact relevant to any legitimate question arising in the interpretation of writings and admissible under the .general rules of evidence,’ can be shut out. * * * Sometimes the rule has been stated with the proviso that extrinsic facts may be shown in cases only ‘ where the language alone is of doubtful import. ’ * * * We take this to mean merely that the probable intention of the writer, as indicated by extrinsic facts, may not prevail over the plain meaning of the written word, nor have any force whatever, unless the words incorporated in the writing are susceptible of a meaning which expresses the intent thus disclosed.”
In Gray v. McCausland (314 Mass. 743), a case containing facts quite analogous to those here, a gift was made by the testatrix to her stepchildren of “ all the property of every name and nature left me by my late husband * * * as shown in the inventory of his estate ”. The question certified by the court was whether the gift included the proceeds of certain reinvestments made by the testatrix of the original assets shown in the inventory of her husband’s estate. The court there stated (p. 745): “In deciding this question evidence was properly admitted of the circumstances and conduct of the testatrix and of facts within her knowledge in order to show in what sense she used these words in her will. This evidence is practically unchallenged and in our opinion is highly significant.” The court went on to briefly delineate the facts that both the testatrix and her husband had separate safe-deposit boxes in the same bank each containing the owner’s separate securities. The testatrix continued until her death to maintain the securities separate and apart in the two safe-deposit boxes. During her life some withdrawals were *936 made from savings bank deposits represented by bankbooks in the husband’s safe-deposit box. In reaching its conclusion that the testatrix meant not only items that had remained unchanged but included reinvestments and proceeds of investments, the court commented as follows (p. 747): “In reaching this conclusion we make no use of any declarations of testamentary intent or of the testatrix’ opinion of the meaning of her will. We use the evidence only in so far as it helps to put us in the position of the testatrix, so that we may know the facts that she had in her mind when she chose her words, in order that we may judge of the sense in which she used them.” Part of the evidence received by the court consisted of statements made by the testatrix to her confidential adviser and letters written by her to her stepchildren. The court accordingly decreed that the stepchildren were entitled to the property of her husband not only unchanged in form but “proceeds of such property as had been reinvested by the testatrix, the evidences of which the testatrix at the time of her death kept in the deposit box that had formerly been her husband’s ” (pp. 749-750; italics supplied).
In Speyers v. Manchester (131 Conn. 598) the court held that a provision limiting bequests to testatrix’ relatives to her property other than that received by gift or will from her late husband was not so definite and certain as to preclude the admission of oral and written statements, including a paper signed by the testatrix listing securities owned by her apart from those received from her husband. There the court concluded that since the list of securities owned by her did not include certain reinvestments made prior to the execution of the will even though purchased in part with her own funds and in part by proceeds of sales of her husband’s assets, the gift included such reinvestments.
As the court in Gray v. McCausland (supra) accepted the surrounding facts of separate safe-deposit boxes to determine the sense in which the testatrix employed her language, so in Speyers v. Manchester (supra) the court looked to a list of securities to fathom the meaning of the words employed by the testatrix. The facts here are clearly more akin to those appearing in the Gray case. Putting ourselves in the position of the decedent, she received specific advice from her attorney and counselor with regard to the maintenance of the separate safe-deposit boxes. Although in some cases she chose to place back in safe-deposit box No. 97 certain stock dividends, and in other cases she chose to sell stock dividends, including stock distributions representing stock splits, and deposit the *937 proceeds in her account, the evidence adduced demonstrates a plan of action undertaken by the testatrix to follow out the terms of her will.
Even were this not so, the evidence presently in the record establishes that the proceeds of all of the stock dividends and stock splits in question were deposited to the testatrix’ personal checking account in the Bank of Westbury Trust Company and commingled with her own funds. In this regard, it is significant to note that in the second appeal in Matter of Potter (251 App. Div. 679, affd. 278 N. Y. 534), the court concluded that the tracing of the assets originally in the name of the testatrix’ husband was impossible. The court there stated (p. 682): “ When moneys without earmarks, a quality which all money lacks, are commingled, the possibility of tracing as identifiable property fails. Identity is lost.” The court, though obviously unsympathetic with the result, neveretheless stated (pp. 681, 682): ‘ ‘ The money which she received from her husband’s estate was as much her own as was the other property which she possessed and she was under no legal obligation to keep separate the property received from her husband’s estate.” (See, also, Speyers v. Manchester, supra.)
The court holds that it was the intention of the testatrix to include within the bequest to the petitioner in paragraph “Third” of the will, those securities present at her death in safe-deposit box No. 97 at the Bank of Westbury Trust Company, including any stock dividends physically present in such box, and that such bequest does not include any other stock dividends or stock distributions or the proceeds thereof.
An allowance, as requested by petitioner’s attorneys pursuant to section 278 of the Surrogate’s Court Act, does not fix the value to the client of the services rendered, but rather is limited to compensation to counsel for services which were of aid to the court in its determination of the construction question (Matter of Dickinson, 10 Misc 2d 280). The petitioner’s attorneys are accordingly allowed the sum of $500 payable from the general estate, without prejudice to the right of counsel to seek additional compensation from their client.